Case No. 15-3138 Gary Woods v. FacilitySource LLC, et al. Oral Argument on 2C-15-25 Chelsea Burgess v. Woods Good morning. Good morning. May it please the court, my name is Chelsea Burgess and I represent the appellants Gary Woods and Nicholas Lorenzo in this matter. At this point, I'd like to reserve two minutes for rebuttal, please. Very well. This case involves race discrimination and race association discrimination in the workplace and a hostile work environment. Gary Woods, an African American male, is no longer employed with Appellee FacilitySource but was for over eight years. His now husband, Nicholas Lorenzo, is a Caucasian male and is still employed at FacilitySource. Appellants brought this case as they were the lowest paid account managers at FacilitySource, had not received a promotion to a higher position like most other account managers had received, and were subject to racially based remarks and treatment while at work. Well, I think the allegation is that Woods was subject to the racial remarks, but Lorenzo as well? He was subject to isolation. He did not receive remarks stated directly to him. No, that was Appellant Woods, but he was isolated based. Because Lorenzo is Caucasian, right? Correct. The lower court granted FacilitySource's motion for summary judgment in full. However, this decision was flawed. The most pervasive of the errors was the court's failure to construe all facts in favor of the appellants who were the non-moving party. When presented with conflicting evidence by the appellants and the appellants, the court consistently construed the evidence in favor of the appellees. In addition, the court would weigh the evidence in an attempt to find the truth of the matter. The court also did not accept circumstantial evidence of pretext of wage discrimination and found no... between the parties, where you say one thing and the other side says something else about the facts. Sure. There was a dispute of facts regarding qualifications. The other side stated that several account managers were more qualified than the plaintiffs, whereas we stated that they were not objectively more qualified, considering there were job postings or job descriptions that stated that facility maintenance experience was the most important factor or was very relevant. It was consistently stated throughout that job posting that facility maintenance experience was important. Several of the other account managers who made more that they said were more qualified, they had experience in other areas, such as sales, and the court focused on the sales experience consistently. And this job posting or description said this is not a sales role. Well, the job posting wasn't consistent. I mean, at some point they changed the qualifications for the position, but as it turned out, this fellow had not graduated from high school. He had only half as many credits as he should have had in order to graduate, but he had told not only this employer but his previous employer that he was a high school graduate and had made other misstatements on his resume. So objectively speaking, how can you say that, at least from the point of educational requirements, that he was as qualified as the other people who were hired? Well, it consistently said in those postings that facility maintenance experience was enough or relevant experience or a degree. It was never a requirement that it was just a degree required. But at some point there was a requirement, a minimum requirement. Not only were they asking for a high school diploma, but at some point they switched to a, was it two-year and then four-year college? That was for the senior account management position, for the account management position. Well, he's complaining about not getting that, too, when he couldn't have qualified for that. Well, again, the postings changed, as you mentioned, and originally the posting did not have that requirement. So at a point in time he was qualified to be a senior account manager. In addition, he provided evidence that there were other individuals who did not have college education who did move forward. FacilitySource were unable to put forth any evidence that a high school diploma was required. Well, I don't know what you do about a situation where it turns out that, you know, in the end he didn't ever have the qualifications because he had lied on his resume. Their position, I take it, is they never would have hired him in the first place if they'd known he had only half of the credits necessary to graduate from high school. They did state that. However, none of the individual defendants in this case were employed by FacilitySource at that time. They were unable to provide a statement by Chris Chapin, who was the CEO at that time, that they would not hire someone who didn't have a high school diploma at that time. And they also did not provide any evidence that any customer service representatives, which is what he was hired into, were required to have a high school diploma. Well, as time went on, he got raises and promotions throughout all this. It's not as if he never got any kind of a raise or a promotion. Both of them did, did they not? They both did for several years until Defendant Dwayne Smith was hired, as well as Defendant Jordan Wagner. At that point, their growth stopped. They became account managers, but they did not move forward past that. There were nine to ten other account managers who became senior account managers while Plaintiff Woods and Plaintiff Lorenzo were account managers, eight of which became account managers after those two became account managers. Really, the problem about qualifications is the conclusion of who's best qualified. I mean, the basic facts are as they are. It is not disputed as to the basic facts about education, length of service, those kind of things. It's the conclusion from those basic facts that is at issue on this particular problem you're raising. Any other disputed facts? Yes, there's disputed facts as to who became a senior account manager. The court did not construe the facts in Appellant's favor in that sense. He only compared, or the court only compared the plaintiffs to one other individual who became a senior account manager, Bill Esposito. Plaintiffs put forth evidence that there was another individual who became a senior account manager as well during that time and stated that that individual did become a senior account manager. The other side said she did not. There's evidence put forward that she did. And so that was a mistake of fact in that sense that should have gone to the jury because that issue stopped at the Prima Fascia case for failure to promote, and Mr. Lorenzo did not get to go forward on the other elements of the McDonnell-Douglas test. And so it stopped at the Prima Fascia case because apparently he was not as qualified, and that did bring us back to the qualifications issue. We also had a dispute not only with who was more qualified, but they didn't put forth qualifications for several individuals who were paid more. And for those that they did put forth qualifications for, it was a self-serving statement by Defendant Hayden, which he did not attach any documents of the qualifications, so we take issue with that as well. Self-serving statement, was it within his knowledge to make the statements? He stated that he either had personal knowledge or reviewed records, but did not attach the records. He did not state that he . . . Is that inadmissible? I mean, self-serving is not an objection. The fact that you file something that helps your position, I mean, that's exactly what you're expected to do. So what is the objection to the evidence? Hearsay evidence should not be considered. Okay, you think it's hearsay? We believe much of it is hearsay, considering he did not provide the proper foundation for the documents, that they were kept in the proper course of business. He had knowledge of when these records were put into the system, and so we do take issue that it's hearsay and he did not have personal knowledge of those things. Did you take his deposition? We did not take his deposition, no. Why not? At the time, we felt we had a strong enough case with the plaintiff's statements and affidavits and the depositions we did take. All right, before you run out of time, can you talk about the hostile work environment claim and how you think the isolation was racially based? Because I don't quite see the evidence, at least direct evidence, that it was racially based. Is there direct evidence? Well, there were three non-party witnesses that did state that they believed that the treatment of the appellants, the isolation of the appellants, was due to their race. They believed? I mean, is that admissible? I mean, we're just talking about hearsay and what people are competent to testify. I mean, that's their speculation, conjecture. I mean, that doesn't sound admissible. I mean, disbelief. Well, their opinions are allowed to be used. Opinions based on something else? I mean, what's the underlying basis for the opinion? What they saw. There was a witness, Albrey Mann. She saw that there would be individuals that would come into the office and they'd be walked around Plaintiff Woods, walked around Plaintiff Lorenzo. And it was her opinion, and this Court has stated recently, that opinions from non-party witnesses should be relevant circumstantial evidence. And so she said it was her opinion it was due to his race because they would only stop if it was a black individual or if they asked to talk to Gary Woods. He was the only African American there? Yes, and he was the only. Okay, so they may have isolated him for a reason other than his race, that's all. And you say, well, they only did this to African Americans. Well, he's the only African American, so that's kind of circular there. I mean, do you have anything else? Of the isolation? Yeah, as to whether it's race-based. Well, the other remarks that they made, just circumstantial evidence, that it was all based on his race and the fact that there's no other African American males in senior management whatsoever. Everything cumulative together, and that's what we feel. The Court should have looked at everything cumulatively together, and it should have moved it on to the jury to decide if these eight instances of racially-based comments, even if it was just the eight remarks that the judge found, that should have moved on to the jury to find out if it was sufficiently severe and pervasive. Because eight instances are a lot of instances, and they should have been viewed cumulatively. The same argument applies to the Caucasian for Renz, even though the racial comments were directed to him? He still was consistently isolated. People were told not to interact with him. Because he's a friend of the African American? I mean, that's the theory, I guess. That is the theory, yes. Or a partner. Yes, and they had been for several years, and it was known there. One of the witnesses, Aubrey Mann, was told, we know who you interact with, and it was implied. You think the sexual orientation or race or both or what? We believe it's due to the race, race issue. Sexual orientation has not come out as a reason, but that is their association. That's not a protected characteristic at the moment anyway. At the moment, correct. And so it was about the race issue. And it was because they were clearly associated with one another. But this evidence of pretext, these racial remarks, this atmosphere, that should have also played into the wage discrimination case. This court has found that such racial remarks do play into circumstantial evidence of pretext. They were paid less than several other individuals, and the court found that it wasn't going to question this court's business judgment and cited a Texas case in support, whereas this court has stated that it has never adopted a business judgment rule and should not just blanketly accept a business justification. This court failed to draw all reasonable inferences in the light most favorable to the appellants and instead weighed the evidence in an attempt to determine the truth of the matter. Appellants put forth sufficient facts in which a jury could reasonably find for them, creating genuine issues of material fact. And it should have went to the jury on the issues of wage discrimination pretext, on the issues of the prima facie case for failure to promote, on whether or not the conduct was so severe and pervasive. So for this reason, we would ask that Pelley's were not entitled to judgment as a matter of law and to remand the case back to the district court. Are there any further questions? Judge Merritt? All right, thank you. You'll have your rebuttal. Good morning. Good morning. May it please the court, I'm Karen Dunleavy, and I'm here on behalf of all of the defendants, Facility Source, LLC, Bill Hayden, who is their president and CEO, and two of their managerial employees, Jordan Wagner as well as Dwayne Smith. And I apologize, I'm just getting over a cold, so if you can't hear me, please let me know and I'll try to speak up. I did want to address some of the court's comments with respect to the application process in this case and how these two appellants actually came to be employees of Facility Source. As the court noted, there were significant misrepresentations on two separate applications. The first application was an online application through CareerBuilder, and this was the appellant, Gary Woods. He was applying for an entry-level position, and in fact he did that 12 days after being terminated from his last job at Medco, and he was terminated from that position, as the court knows, for falsifying his employment application there. In order to even submit an application to make the threshold to even get it to Facility Source, he had to indicate that he had a high school degree or equivalent, and of course he misrepresented that, which got his resume out in front of the employer. Let me ask you this. When he started with this company, he was a customer service representative? That's correct. What does that mean? He's in a call center. They have a large call center up in Columbus, and so if there was an issue with perhaps a retailer who had a plumbing issue and somebody's complaining about the service that was provided, he's an entry-level person. He's taking phone calls and addressing it to the appropriate account managers and the senior account managers who would be responsible for the account to address the problems. Okay. Billing issues and things like that as well. So the question about whether these other people had sales experience, when you get up to the level of account manager and senior account manager, are you doing any sales up there? Are they pitching to new customers? They're not doing pitching, but frankly I like to think we all have to do sales to some extent, so I think it's a valuable qualification for any job this day and age. But the employer in this case really was not focusing on sales. Any relevant business experience was something that was looked at favorably. In addition, the evidence shows that they looked at relevant education, business in particular, if there's a business degree or some business studies. Okay. There are a lot of individuals that were identified that were discussed in the briefing that had retail experience, so somebody that may have been in one of their prior customers, that they would be able to have that experience of knowing what types of issues they have and the required responsiveness that's expected from them. What do you say to the argument that she makes here that the case is really about qualifications? Who is better qualified, not better qualified? Decisions are being made on that basis, and that that is a factual issue that ought to go to the fact finder. So what is your response to that overall argument? Your Honor, my response to that would be that that's part of the business judgment here, that the employer sufficiently identified the factors that would be considered in determining what those qualifications were. It's apparent from the deposition testimony that the appellants very firmly believed that seniority should have been the number one factor to be considered, and that's why they took the position that they did, that a year after their employment started, they should have been doubled in their compensation, and that by the time they assumed this account management position, they should have been making $64,000 a year, which no account manager, even the ones that had master's degrees, ever had. So their consideration of what those appropriate factors are is their opinion. This is an employer who took into effect legitimate, non-discriminatory factors in deciding who they felt were the best qualified, and with respect to every individual that was identified as a comparator, they were able to show exactly why they felt that that person was more or less qualified. So your argument is the employer, under the business judgment rule, can determine the factors that he's going to deem relevant for qualification purposes, and here the jury doesn't second-guess that, and the jury would adjudicate facts, but here the facts are undisputed, right? The only question is whether the employer's criterion, I guess, makes sense, but it's non-discriminatory. It doesn't violate the law. It does seem rational, I think. I would agree with that, Your Honor, and in fact, in this case, there's really not even a close call between any of the comparators and either of the appellants in this case, and it's really they've tried to put the burden back on the employer to go through the entire list of every employee and show what the qualifications were comparative to them, but in fact it's their burden to identify who those comparators are and to show that they were equally qualified. I think there's no question with respect to the appellant Woods that he wasn't qualified comparatively to anybody because he didn't have a high school education, and no person in that entire facility was hired without an education. So you're saying there's no factual dispute about the falsification of the backgrounds here? Correct. And even if you look at what the employer believed to be the case with respect to his qualifications, which is what we did in our briefing, even with a high school education, comparatively speaking, there really was no comparison. Both appellants testified that they felt that when they took this position as an account manager that the president and CEO who had promoted them had misrepresented what the going rate, quote-unquote, was for those positions at that time, and they were told by Bill Hayden, the president and CEO, that it was $40,000. And if you look closely enough at the documents and you look a year before Gary Woods became an account manager and a year after Gary Woods became an account manager and what those account managers were paid, and you average those out, it's $39,755. And he said the going rate's $40,000. That's what they were paid. They were, in fact, paid a little bit above what the, quote-unquote, average would have been for all those account managers hired in that time frame. And there's testimony on the record about the significant growth that FacilitySource had seen in the first five years. FacilitySource first started operating under that name in 2005. For the next five years, they had 25% to 30% growth each year, and because of that growth they were able to begin recruiting, retaining, and hiring individuals with more significant qualifications, both in terms of their relevant business education as well as their experience. As I said, the burden to identify comparators is on the appellants, and in this case it's been a bit of a moving target, and during the course of the depositions they identified two individuals as being comparators, David Sigman and Mike Rogers. As the district court had noted, David Sigman was only making $300 a year different from Mr. Lorenzo, and I think it was $800 a year different from Mr. Woods, and so they didn't consider that a sufficient enough disparity in pay to address that. I think it boils down to like $1 a day and $3 a day, respectively. And then Mike Rogers was the other individual who was identified during the course of the depositions as a comparator who was unfairly being compensated more. Mr. Rogers, in fact, has a Bachelor of Science degree in business management, and he also had 10-plus years of management, including some retail experience, which was helpful for the organization. Not surprisingly, the appellants, when the motion for summary judgment was filed, abandoned Mike Rogers as a comparator and tried to find some others, and they identified the Stephen Zeruca, who was never mentioned once during the course of the depositions. And Mr. Zeruca actually studied business at Columbia University in New York City as well as Ohio State University. He did not have a degree but had some education there as well as 24 years of retail management experience. The other individual who was identified in the briefing as a comparator was Josh Haleco. Mr. Haleco has a business degree, Bachelor of Science in business administration, and he has account management experience, had it coming in. All of this is to support the exercise of the business judgment rule by the defendant. Is that what you're saying? Correct. And more specifically than that, to identify those comparators and why they were considered to be more qualified by the employer in this case. I'd like to, because I don't have a whole lot of time left, I'd like to kind of turn to the hostile work environment claim. I think it's important to look at the entire context and look at what was going on in this work environment. And this is, as the court has noted, primarily pertaining to Mr. Woods. He described the comic relief that was going on in this workplace. If you read the deposition, it sounds like kind of a fun workplace. They did some silly things that might not necessarily be the most professional, but it was things that he very much was a participant in and testified that he really praised his role in providing the comic relief for his coworkers. He very much appreciated that as he testified, and he did things intentionally to try to be crazy and outrageous while he went through his workday. Testified about how the whole organization and his coworkers enjoyed to kick back and cut up. There was testimony about how Dwayne Smith, the supervisor, would offer time off for employees if they went in and sang a song to those individuals working in the call center. And in response, Mr. Woods gave them a pink cowboy outfit, complete with a cattle prod of some sort, for him to wear to sing, which he did not do, thankfully. But from the testimony, you can see that it's pretty clear that he really enjoyed to be silly and that he enjoyed making his coworkers laugh. But then you read the briefs and he complains that he was being called cheeky, which is exactly what he appreciated in himself and his role in the workplace. You see, it's hard for us to read a cold record and see how he reacts to it. I mean, the words can be interpreted different ways. And, I mean, that's something almost you need a jury or a trier of fact to say, because it could be in humor and in jest or it could be serious, demeaning, hurtful. And one's actionable, one's not. But it's hard to say as a matter of law, reading a record, it's one or the other. That's all. And I don't think it's that difficult in this case, Your Honor, because the comments that were made I don't think even remotely come close to what should be sufficient to satisfy a hostile work environment. Even if there's not one, the one's not that bad, this one's not too bad, but when you lump them all together, don't you have maybe the accumulation of them? I don't think so, Your Honor. And a lot of the comments that were made, there's no context to them. And some of them were never addressed during the course of the deposition. This comment about fried chicken, I don't know what that means. I mean, was he eating fried chicken in the lunchroom? Was he making Kool-Aid? There was no context other than that he likes fried chicken. That's a racial stereotype, and that's what it is. Whether they say it in a demeaning way or whether they're joking around, I mean, maybe they're just joking around and doesn't, you know. But at least on appeal, he's saying that this was very hurtful to me, and I could see how it could be hurtful if it's taken that way or if it was made that way, that's all. And to the extent that it wasn't addressed in his deposition after he was given multiple opportunities to make sure he gave an exhaustive list of anything he found to be offensive, and then it appears in his affidavit, I don't think it should be considered since it's inconsistent with his prior testimony. But even more importantly, on the hostile work environment claim, the appellants both went to Human Resources in October of 2012 and allegedly reported that they felt that there was a hostile work environment going on. And Mr. Woods very clearly testified there was nothing that happened after he went to Human Resources. The joking in the comments stopped as soon as that happened, and I found it curious that he almost seemed disappointed that this stopped because he did appreciate the atmosphere there, and he said that he was disappointed because people don't joke around with me like they used to and that he would prefer that people be more engaging. Well, I mean, if he did think it was a joke, why did he complain to Human Resources about it? I mean, he never complained to Human Resources about any of these specific instances. His primary complaint was with respect to his compensation analysis. I thought you told me that he complained about the hostile work environment. In very general terms, with no specifics. None of these specific items were addressed. What else would it have been? I mean, is there something else that we don't know about? Well, we didn't know about these at that point in time. And he had complaints about Dwayne Smith in particular, that he felt that Dwayne Smith was not treating him fairly, that he discriminated against him, and the testimony was that as soon as he made that complaint that all the comments and anything offensive had stopped. Did he use the term hostile work environment? No. Or his claim of general discrimination? Just general discrimination. I don't recall that there was a reference to hostile work environment. Okay. Well, I mean, actually, that's how you stated he did go to that. My apologies. I didn't mean to. Well, no. I mean, he's got a stronger case if he goes there and says, I'm complaining about hostile work environment rather than wage discipline. He wasn't a lawyer, and he didn't know the lingo. Correct. Correct. And I do find it interesting. I mean, we did videotape his deposition, and while he was describing some of these things that he found to be so offensive, he was, in fact, laughing as they were being discussed, which I thought was interesting. If I could turn for a moment to the promotion issue. They've indicated that they feel as though they were not properly promoted to a senior account manager position. As the district court noted, neither of them had actually applied for it, was not qualified for it. On this issue of Katie Kinzig, there was no testimony with respect to whether or not she held a position. I'm sorry, with Katie Kinzig, the issue was that those with knowledge said she had never been a senior account manager. Mr. Woods and Mr. Lorenzo have no basis for saying that in their opinion they thought that that was what she was, and I don't see that that creates any issues of fact. So we would just ask the court to please uphold the district court's grant of severing judgment on all claims. Any further questions of Judge Merritt? All right, thank you, counsel. Two minutes rebuttal. Thank you. I'll start in with the hostile work environment discussion that was just taking place. Counsel minimized several of the comments that were made and how Plaintiff Woods felt by these comments. Several of these comments you mentioned were started with, you people, he did not feel this was funny. He interacted, he joked with his coworkers, but not all of it was fun and games. There were other things. He was told he looked like Dizzy Gillespie, that the cheeky was describing his physical attributes, and he was called the eye of the storm. You people are dramatic. And the racial stereotype, the fried chicken and Kool-Aid, that was independent evidence from a third party. She heard that being said. Much of this counsel discounted because it wasn't mentioned at the deposition, but it wasn't his affirmative duty to have to bring that up in the deposition. He did not have to volunteer testimony, and it was not directly different than what he stated in his deposition. It was additional evidence that was put forward in the affidavit. And Plaintiff Lorenzo was also treated better after not associating with, I mean, not Plaintiff, Zach Stewart. He is another person who was friends with Gary Woods. He became treated better afterwards, after he stopped interacting with Plaintiff Woods. This says something. In addition, counsel said that there was no evidence that Sigmund, Halecko, Rogers, Zerucha were all not more qualified, whereas they did not have any facility maintenance experience. Facility maintenance experience was important. The plaintiffs were trained in the roles. They had facility maintenance experience. This is a facility maintenance company. They were objectively qualified. Going into the more subjective qualifications of whether or not being a sales representative is helpful, that's not what should have came in at this point, and that's for a jury to decide. It specifically said in the job description, this is not a sales role. Going back to Plaintiff Woods not having graduated from high school, this is not a bar to discrimination. After acquired evidence of misconduct is not a bar to discrimination. Thank you. Thank you. Any further questions? Thank you, counsel. A case will be submitted. You may call the next case.